UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KABIR, INC, and ANIL BHAKTA,

Plaintiffs,

vs. Case No.: 3:03cv513/LAC/MCR

HOWARD JOHNSON INTERNATIONAL, INC.,
a Delaware corporation,

Defendant.

_______________________________________/

**DEFENDANT HOWARD JOHNSON INTERNATIONAL, INC.'S NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Howard Johnson International, Inc. ("HJI"), hereby removes to the United States District Court for the Northern District of Florida, Pensacola Division, the state court action described below. As grounds for removal, HJI states:

1. This case was commenced by Plaintiffs Kabir, Inc. ('KABIR") and Anil Bhakta ("BHAKTA") (collectively "Plaintiffs") in the Circuit Court of the First Judicial Circuit in and for Okaloosa County, Florida as Case No. 03-CA-4209. A copy of the Complaint filed in the state court is attached hereto as **Exhibit A**. A copy of the Summons is attached hereto as **Exhibit B**.

2. On October 13, 2003, the state court entered a Mediation and Scheduling Order, a copy of which is attached hereto as **Exhibit C**.

1

3. On October 17, 2003, Plaintiffs served a copy of the Summons, Complaint, and Mediation and Scheduling Order on Corporation Service Company, HJI's Registered Agent in Florida.

4. This Notice of Removal is timely because it is being filed within thirty (30) days after HJI was served with the Summons and Complaint. See 28 U.S.C. § 1446 and Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 119 S.Ct. 1322, 143 L.Ed.2d 488 (1999) (deadline for removal begins to run when defendant is formally served).

5. This case involves a franchise relationship between the parties concerning a 75 guestroom hotel (Complaint ¶ 10) operated by Plaintiffs. Plaintiffs attempt to allege that HJI improperly terminated the franchise and that it made allegedly fraudulent representations concerning the franchise and its intended performance. Plaintiffs' Complaint contains the following counts:

Count I - Fraud in the Inducement;
Count II - Fraud in the Uniform Franchise Offering Circular;
Count III - Breach of Covenant of Good Faith and Fair Dealing;
Count IV - Breaches of the Implied Duty to Cooperate/Hindrance of Performance;
Count V - Fraudulent Misrepresentation;
Count VI - Unconscionability, Common Law;
Count VII - Breach of Contract; and
Count VIII - Violation of the Florida Franchise Act.

Although HJI disputes that it has any liability to Plaintiffs and contends that Plaintiffs have failed to state a claim upon which relief may be granted, HJI expressly incorporates the allegations contained in the Complaint attached hereto as **Exhibit A** for the purpose of demonstrating the propriety of removal.

6. The Court's removal jurisdiction in this case is based upon diversity of citizenship, pursuant to 28 U.S.C. §§ 1332 and 1441.

7. At the time the Complaint was filed, presently, and at all other times material hereto, KABIR has been a citizen of the State of Florida; it is a Florida corporation and its principal place of business is located in Okaloosa County, Florida. (See Complaint, ¶ 1.)

8. Plaintiff BHAKTA is a natural person and is a resident of Okaloosa County, Florida. (See Complaint, ¶ 2.) At the time the Complaint was filed, presently, and at all other times material hereto, BHAKTA has been a citizen of the State of Florida.

9. At the time the Complaint was filed, presently, and at all other times material hereto, HJI has been a citizen of Delaware and New Jersey. HJI is a Delaware corporation and its principal place of business is located in Parsippany, New Jersey. (See Complaint, ¶ 3.)

10. Complete diversity exists in this case, as neither of the Plaintiffs is a citizen of the same state as HJI, and neither have been at any time material hereto. Further, HJI has never been a citizen of the State of Florida (it has never been a Florida corporation and its principal place of business has never been located in Florida).

11. Although Plaintiffs have not alleged any specific amount of damages in their complaint, the amount in controversy in this case exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs, as evidenced, *inter alia,* by the following:

a. Plaintiffs seek damages for, *inter alia,* what they claim was the unjustified termination of a 15 year franchise agreement. (See e.g., Complaint ¶ 16 and ¶ 21 - "HJI intentionally falsified the quality assurance scores to provide a pretextual reason to terminate the franchise and seek liquidated damages.") Plaintiffs also seek damages for alleged fraud and alleged breaches of various expressed and implied obligations. Plaintiffs will likely seek to

recover the money they spent in connection with the franchise, including the initial application and franchise fees in the amount of $11,000 paid to HJI in December of 2001, money spent to rehabilitate the hotel building (see e.g., Complaint ¶ 18 alleging that that HJI required them to spend "tens of thousands of dollars" making improvements to the subject property) and recurring charges under the franchise (see e.g., § 7 of the License Agreement, attached hereto as **Exhibit D** - royalties, marketing charges, etc.).

b. As there were over 13 years remaining in the initial franchise term when it was terminated, it is likely that Plaintiffs will seek a very significant amount of damages for alleged lost profits. Even if Plaintiffs were only able to prove net lost profits in the amount of $500 per year for each of their 75 guestrooms, the amount in controversy on that claim alone would exceed $450,000 over the remainder of the original franchise term (before being reduced to present value).[1]

c. On August 11, 2003, HJI provided Plaintiffs notice of termination of the franchise and demanded that KABIR pay HJI liquidated damages and past due recurring fees in excess of $80,000. A copy of this letter is attached hereto as **Exhibit E**. In alleging fraudulent inducement and in seeking damages and "such other and further relief the Court deems just and proper," Plaintiffs are seeking the functional equivalent of a declaratory judgment that HJI's claims for the past due recurring fees and liquidated damages are invalid. This is clearly reflected in the "Introduction" section of the Complaint, where Plaintiffs make the following allegations: HJI sought to "lure Plaintiffs into signing a License Agreement for the purpose of extorting significant and unjustified fees from them, as well as unlawful penalty damages . . . that HJI contends are due it upon the termination of the franchise" (¶ 6); "HJI intended to grant the franchise to Plaintiffs for the sole purpose of terminating the franchise . . . and seeking

---

[1] As previously stated, HJI strenuously denies any liability to Plaintiffs. However, for purposes of this analysis, one must look to what is claimed rather than to what is likely to be successfully recovered.

outrageous liquidated damages from Plaintiffs." (¶ 8); and "Through this scheme, HJI sought to collect unearned recurring fees as well as penalty liquidated damages . . . ." (¶ 9). Thus, the $80,000 plus that is owed to HJI under the License Agreement is very much an "amount in controversy." If Plaintiffs prevail on a fraudulent inducement claim they will not only recover whatever damages they can prove, but also will escape having to pay the money presently demanded by HJI under the contract that Plaintiffs seek to disaffirm.

d. Florida law gives the fact finder the discretion to award punitive damages in cases where fraud has shown to have caused the claimant actual damages. See First Interstate Development Corp. v. Ablanedo, 511 So.2d 536, 539 (Fla. 1987). Plaintiffs will likely seek punitive damages in an amount at least equal to their claim for compensatory damages.

e. Plaintiffs seek an award of their attorneys fees in Count VII ("Breach of Contract") and Count VIII ("Violation of the Florida Franchise Act"). Section 17.4 of the License Agreement provides for a prevailing party attorneys' fee award. Florida Statutes § 817.416 (which Plaintiffs reference in Count VIII) provides for the award of attorneys' fees to a person who proves a violation of the statute. Plaintiffs' request for an award of attorneys' fees should be considered in determining whether the requisite amount in controversy has been demonstrated. See Federated Mutual Insurance Company v. McKinnon Motors, LLC., 329 F.3d 805, 808 fn.4 (11th Cir. 2003) (stating that the general rule is that attorneys' fees do not count towards the amount in controversy *unless* they are allowed for by statute or contract). Given the serious nature of the allegations in the Complaint, it is not unreasonable to conclude that any potential attorneys' fee award would be in the range of $50,000 to $100,000.

12. HJI reserves the right to submit additional information to demonstrate the propriety of removal in this case, including affidavits and discovery responses, should Plaintiffs move to remand the case to state court, or as may otherwise become necessary in the future. See

Sierminski v. TransSouth Financial Corp., 216 F.3d 945, 948-949 (11th Cir. 2000) (holding that the district court may consider information relevant to the jurisdictional determination that is submitted after the notice of removal is filed).

13. HJI is, and has been at all times, the only defendant in this case.

14. Pursuant to 28 U.S.C. § 1446(d), HJI is serving written notice on Plaintiffs of the filing of this Notice of Removal, and will serve and file a true and correct copy of this Notice of Removal with the Clerk of the First Judicial Circuit Court in and for Okaloosa County, Florida.

15. No process, pleadings, or orders have been served on or by HJI in this action other than those attached hereto as Exhibits A, B and C.

16. HJI has not attempted to litigate this case in state court or taken any action that could be construed as a waiver of its right of removal.

17. HJI intends to assert counter-claims in this case seeking a money judgment for damages in excess of eighty thousand dollars ($80,000). Further, to the extent that Plaintiffs have continued to use HJI's trademarks after the franchise termination, then HJI intends to assert claims under the Lanham Act, 15 U.S.C. § 1125.

18. In accordance with 28 U.S.C. § 1441(a), venue lies in the United States District Court for the Northern District of Florida, Pensacola Division, because the state court action was filed within this judicial district and division.

WHEREFORE, HJI hereby removes this case to this Court's jurisdiction.

Respectfully submitted,

William E. Davis, Esquire
Florida Bar No.: 191680
Scott C. Davis, Esquire
Florida Bar No.: 022799
Jon T. Gatto, Esquire
Florida Bar No.: 547328

BUCHANAN INGERSOLL PC
Bank of America Tower, Suite 2100
100 S.E. Second Street
Miami, Florida 33131
Telephone: (305) 347-4080
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. mail and facsimile upon **Richard H. Powell, Esquire**, Richard Powell & Associates, P.A., P. O. Drawer 2167, Fort Walton Beach, FL 32549 and **Jeffrey M. Goldstein, Esquire**, The Goldstein Law Group, P. C., 818 18th Street, N.W., Suite 505, Washington, DC 20006, on this 5th day of November, 2003.

William E. Davis, Esquire
Florida Bar No.: 191680
Scott C. Davis, Esquire
Florida Bar No.: 022799
Jon T. Gatto, Esquire
Florida Bar No.: 547328
BUCHANAN INGERSOLL PC
Bank of America Tower, Suite 2100
100 S.E. Second Street
Miami, Florida 33131
Telephone: (305) 347-4080
Attorneys for Defendant

71683

[illegible] DISTRICT COURT

[illegible]

[illegible] 10456

[illegible]

[illegible] Type [illegible]

[illegible]

[illegible]
JOHNSON [illegible]

[illegible]

IN THE CIRCUIT COURT IN AND FOR
OKALOOSA COUNTY, FLORIDA

KABIR, INC.,
and ANIL BHAKTA,

Plaintiffs,

v.

CASE No.: 03-CA- 4209

HOWARD JOHNSON INTERNATIONAL INC., a Delaware corporation,

Defendant.

## COMPLAINT AND DEMAND FOR JURY

COME NOW Plaintiffs, Kabir, Inc., ("Kabir") and Anil Bhakta, ("Bhakta") (collectively, "Plaintiffs"), hereby file their Complaint against Howard Johnson International, Inc. ("HJI") and allege as follows:

## PARTIES

1. Plaintiff Kabir is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Okaloosa County, Florida.
2. Plaintiff Bhakta, a natural person, is a resident of Okaloosa County, Florida.
3. Defendant HJI is, upon information and belief, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey, and registered as a foreign corporation to conduct business in the State of Florida.
4. The events complained of took place in Okaloosa County in the State of Florida.
5. This is an action for damages that exceed $15,000, exclusive of interest and costs;

## INTRODUCTION

6. This case involves a fraudulent scheme and a pattern of wrongful conduct, intentionally and willfully devised, implemented and carried out by HJI to lure Plaintiffs into signing a License Agreement for the purpose of extorting significant and unjustified fees from them, as well as unlawful penalty damages (referred to by HJI as liquidated damages) that HJI contends are due it upon the termination of a franchisee.

7. The fraudulent scheme consists of HJI, through its agents, the License Agreement and its Uniform Franchise Offering Circular, falsely promising to provide sufficient reservations, marketing, training, and advertising support to increase the revenues of Bhakta's hotel in Destin, Florida and ensure that the hotel remains a viable and profitable entity, thereby inducing Plaintiffs to enter into the License Agreement.

8. HJI intended to fraudulently induce Plaintiffs into entering a franchise agreement for a Howard Johnson hotel even though HJI knew that Bhakta's hotel had repeatedly failed HJI quality assurance inspections when operated by a previous HJI franchisee and HJI believed that the hotel's facility and structure as they existed could not pass HJI standards. HJI intended to grant the franchise to Plaintiffs for the sole purpose of terminating the franchise for falsified quality assurance failures and seeking outrageous liquidated damages from Plaintiffs.

9. Through this scheme, HJI sought to collect unearned recurring fees as well as penalty liquidated damages without expending any efforts to assist Plaintiffs'

business, despite HJI's obligations to do so.

## FACTUAL ALLEGATGIONS

10. There exists a License.Agreement (hereinafter "License Agreement") with a date of December 7, 2001, between HJI and Plaintiffs for the operation of a 75-room guest facility located at 712 Highway 98, Destin, Florida, Site No. 7289. Bhakta owns and Kabir operates the 75-room hotel property, ("The Property") which is the subject of this litigation.

11. Bhakta purchased The Property in October 2001 from a bankruptcy estate. The Property had been operated by a previous owner as a Howard Johnson franchise hotel. When Bhakta bought the Property via the bankruptcy trustee, he intended to operate The Property as an independent hotel.

12. Even before the closing on his purchase of The Property, Bhakta was visited by Michael Stark, ("Stark") a franchise salesman for Defendant HJI, urging Plaintiffs to purchase a Howard Johnson franchise for The Property. Stark made many sales calls to Plaintiffs over the next several months, attempting to convince Plaintiffs to enter a franchise agreement with HJI. While Plaintiffs were attempting to ready the hotel to open, Stark was pressuring them to buy a Howard Johnson franchise.

13. HJI and Stark knew that HJI had given failing quality assurance scores to the previous Howard Johnson franchise at The Property and believed that the Property did not meet HJI standards. Nonetheless, Stark assured Plaintiffs that

HJI would approve his franchise application and "work with" Plaintiffs on any needed improvements, which Stark indicated would not be substantial.

14. Stark showed Plaintiffs what Stark claimed were statistics showing significantly greater reservations for hotels operating as a franchised brand versus independently operated hotels. Stark promised Plaintiffs that the HJI reservation system would give Plaintiffs a higher occupancy rate at The Property than Plaintiffs could achieve operating independently. Plaintiffs relied upon these material representations. Stark also represented to Plaintiffs that the average daily rate for room rentals at Howard Johnson hotels was higher than for independent hotels or for other, similar hotel brands. These representations were false.

15. Stark also told Plaintiffs, who had never owned a hotel before, that Plaintiffs would make $1.2 million per year with a Howard Johnson franchise at that location knowing the material statements to be false.

16. Reasonably relying on Stark's promises and representations, on or about December 7, 2001, Plaintiffs and HJI entered a 15-year franchise agreement regarding The Property.

17. Plaintiffs were given a "punchlist," or list of required improvements and renovations, that had to be completed before opening. That punchlist was expanded after Plaintiffs signed the franchise agreement.

18. Plaintiffs expended tens of thousands of dollars in improving The Property, and following a visit to The Property HJI President Mary Mahoney wrote a March 4,

2003 letter offering "congratulations on a job well done". See Exhibit "1."

19. Plaintiffs expended significant time, money and effort in reliance on HJI's promises and representations that it would substantially and actively assist him in building and operating a profitable hotel business. Despite those promises and HJI's obligations to do so, HJI wrongfully made almost no efforts to provide the reservations, market, training and other support it was obligated to give Plaintiffs, causing Plaintiffs to lose money and not gain the benefit of his bargain.

20. Although HJI had approved The Property to open as a Howard Johnson, after Plaintiffs had opened The Property as a Howard Johnson, HJI in November 2002 wrongfully gave The property a failing score on its first quality assurance inspection. On the next quality assurance inspection in April 2003, HJI likewise wrongfully gave The Property a failing score, despite HJI's approval to open The Property as a Howard Johnson little more than a year before. Notably, The Property received passing marks on the housekeeping portion of both quality assurance inspections.

21. HJI then demanded very substantial additional renovations that it had failed to disclose to Plaintiffs during the punchlist negotiation process. Despite Plaintiffs' diligent efforts to perform the renovations, HJI again trumped up a third quality assurance failure for the property in June 2003. HJI intentionally falsified the quality assurance scores to provide a pretextual reason to terminate the franchise and seek liquidated damages.

22. From the time The Property opened as a Howard Johnson until Plaintiffs'

termination as a franchisee, HJI failed to provide the levels of reservations HJI promised and was obligated to provide.

23. Pursuant to the License Agreement, HJI was required to provide a Reservation System that would provide a reasonable and sufficient number of reservations to The Property.

24. Notwithstanding HJI's obligation to provide a Reservation System, HJI failed to provide a reasonable and sufficient number of reservations. In fact, HJI provided no reservations for the majority of the time, and few reservations during even the peak summer tourism season.

25. Pursuant to the License Agreement, HJI was required to provide marketing to promote public awareness of The Property in order to maintain its marketability and viability.

26. Notwithstanding Franchisor's obligation to provide marketing to The Property, HJI failed to provide the required marketing.

27. Pursuant to the License Agreement, HJI was required to provide training to assist Bhakta in operating the Property.

28. Notwithstanding HJI's obligation to provide training, Plaintiffs did not receive the required training.

**<u>COUNT I: FRAUD IN THE INDUCEMENT</u>**

29. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

30. By, *inter alia*, its actions and inactions, as set forth above and below, HJI

fraudulently induced Plaintiffs into contractual agreements with HJI.

31. Plaintiffs relied to his detriment on HJI's misrepresentations of material facts.

32. HJI's promises were made with the knowledge that HJI would not keep them and were made with the intent to induce Plaintiffs to act.

33. Plaintiffs acted in reliance on HJI's promises and representations.

34. These actions and inactions caused damage to Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for damages for fraud in the inducement, interest and costs together with such other and further relief the Court deems just and proper.

**COUNT II: FRAUD IN THE UNIFORM FRANCHISE OFFERING CIRCULAR**

35. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

36. Upon information and belief, HJI made, *inter alia*, misrepresentations and material omissions in its Uniform Franchise Offering Circular.

37. HJI's promises were made with the knowledge that HJI would not keep them and were made with the intent to induce Plaintiffs to act.

38. Plaintiffs acted in reliance on HJI's promises and false representations and entered into contractual agreements with HJI.

39. These actions and inactions caused damage to Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for damages for fraud in the Uniform Offering Circular, interest and costs together with such other and further relief as the Court deems just and proper.

COUNT III: BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING

40. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

41. HJI by, *inter alia*, its actions and inactions, purposely deprived the Bhakta of the fruits of the License Agreement and acted directly contrary to the reasonable expectations of the Bhakta under the License Agreement.

42. By, *inter alia*, its actions and inactions, as set forth above and below, HJI has breached the covenant of good faith and fair dealing.

43. These actions and inactions have caused damage to the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for breach of the covenant of good faith and fair dealing, interest and costs together with such other and further relief as the Court deems just and proper.

COUNT IV: BREACHES OF THE IMPLIED DUTY TO COOPERATE/HINDRANCE OF PERFORMANCE

44. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

45. Assuming Plaintiffs failed to fully carry out their obligations under their contractual agreements, which they specifically deny, HJI, *inter alia*, engaged in egregious conduct that prevented and hindered the Plaintiffs from performing their obligations under their contractual agreements.

46. By, *inter alia*, its actions and inactions, as set forth above and below, HJI has

breached its duty to cooperate and to not hinder the performance of the contractual obligations.

47. These actions and inactions have caused damage to the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for breaches of the implied duty to cooperate/hindrance of performance, interest and costs together with such other and further relief the Court deems just and proper.

**COUNT V: FRAUDULENT MISREPRESENTATION**

48. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

49. HJI and its agents fraudulently misrepresented, with intent to deceive *inter alia*, material information to the Plaintiffs.

50. HJI intended, or should have recognized, *inter alia*, that the Plaintiffs would likely be damaged by its actions taken in reliance on HJI's misrepresentations.

51. These actions and inactions have caused damage to the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for fraudulent misrepresentation, interest and costs together with such other and further relief the Court deems just and proper.

**COUNT VI: UNCONSCIONABILITY, COMMON LAW**

52. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

53. HJI, by, *inter alia*, its conduct, acted unconscionably in dealing with the Plaintiffs.

54. These actions and inactions have caused damage to the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendant for unconscionability, interest and costs together with such other and further relief the Court deems just and proper.

## COUNT VII: BREACH OF CONTRACT

55. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

56. There exist contractual agreements among HJI and Plaintiffs under which HJI incurred, *inter alia*, certain obligations.

57. HJI was also obligated by its oral representations to Plaintiffs.

58. By, *inter alia*, its actions and inactions, as set forth above and below, HJI has materially breached its contractual agreements with Plaintiffs.

59. These actions and inactions caused damage to Plaintiffs.

60. Plaintiffs have retained the services of Richard H. Powell & Associates, P.A. and The Goldstein Law Group, P.C., to represent them in this cause and are obligated to pay them a reasonable fee for their services and is entitled to an award of reasonable attorneys fees in connection herewith pursuant to **Exhibit "1."**

WHEREFORE, Plaintiffs pray for judgment against Defendant for damages for breach of contract, interest, costs and attorney fees together with such other and further relief the Court deems just and proper.

## COUNT VIII: VIOLATION OF THE FLORIDA FRANCHISE ACT

61. The allegations contained in paragraphs 1-28 are incorporated as if set forth fully herein.

62. This is an action for violation of Florida Statutes § 817.416, The Florida Franchise Act.

63. Defendant has violated the provisions of Florida Statutes § 817.416 (2) by intentionally misrepresenting to Plaintiffs the prospects or chances of success of a franchise operation as stated above.

64. The actions of Defendant caused Plaintiffs damages.

65. Plaintiffs have retained the services of Richard H. Powell & Associates, P.A. and The Goldstein Law Group, P.C., to represent them in this cause and are obligated to pay them a reasonable fee for their services and are entitled to an award of reasonable attorneys fees in connection herewith pursuant to the provisions contained in § 817.416 (3)

WHEREFORE, Plaintiffs pray for judgment against Defendant for violation of Florida Statutes §816.416 (2), interest, costs and an award of reasonable attorney's fees together with such other and further relief the Court deems just and proper.

66. Plaintiffs demand trial by jury for all issues and counts so triable.

RICHARD H. POWELL, ESQ.
RICHARD H. POWELL &
ASSOCIATES, P.A.
P.O. Drawer 2167
Fort Walton Beach, FL 32549
(850) 243-7184
Fla. Bar No. 138695

JEFFREY M. GOLDSTEIN, ESQ.
THE GOLDSTEIN LAW GROUP, P.C.
818 18th Street, N.W., Suite 505
Washington, DC 20006
(202) 293-3947

ATTORNEYS FOR PLAINTIFF

**Howard Johnson**
HOTELS & INNS

MARY MAHONEY
President
Chief Executive Officer

March 4, 2003

Mr. Anil Bhakta
Howard Johnson Express Inn
713 Highway 98 East
Destin, Florida 32541

Dear Anil:

It was a pleasure to meet you on my recent visit to Florida's Panhandle region. I wanted to extend a personal, warm welcome to the Howard Johnson family. Sherry Kosack was correct that you were completing many of the required items on the punch list and working hard to bring the property up to our brand's quality standards. May I offer my congratulations on a job well done. If you stay the course, your property will be a beautiful site and should also be a very profitable venture for you.

I encourage you to stay in touch with Sherry, Dan Olsen and Greg Momat to help you through your next quality inspection. I'll be keeping my eye on you as well. I know you will accomplish what you have set out to do, and we will be very proud of the end product. Again, welcome to the Howard Johnson family. Please let me know if I can be of assistance to you.

Best regards,

Mary Mahoney
President, Howard Johnson International

c: Sherry Kosack, Rui Barros, Dan Olsen, Jim Clancy, Greg Momat

EXHIBIT
"1"

HOWARD JOHNSON INTERNATIONAL, INC.
Sylvan Way • Parsippany, NJ 07054 • Phone (973) 496-8932 • Fax (973) 496-1933 • E-mail mary.mahoney@cendant.com • Website www.hojo.com • Toll Free (800) 932-4656

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR OKALOOSA COUNTY, FLORIDA

CIVIL ACTION

KABIR, INC., and
ANIL BHAKTA
Plaintiff

CASE NO. 03ca4209

-vs-

HOWARD JOHNSON INTERNATIONAL, INC
a Delaware corporation
Defendant

SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:

GREETINGS:

YOU ARE HEREBY COMMANDED to serve this summons and a copy of the complaint or petition in the above styled cause upon the defendant(s)

Howard Johnson International, Inc.
Registered Agent Corporation Service Company
1201 Hayes Street
Tallahassee, FL 32301

Each defendant is hereby required to serve written defenses to said complaint or petition on plaintiff's attorney, whose name and address is:

Richard H. Powell, Esq.
Richard H. Powell & Associates, P.A.
P.O. Drawing 2167
Fort Walton Beach, FL 32549

within 20 days after service of this summons upon that defendant, exclusive of the day of service, and to file the original of said written defenses with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

WITNESS my hand and the seal of said Court on October 13, 2003.

William T. Vause
Certified Process Server ID#30
Second Judicial Circuit Florida
Date 10-17-03 Time 1:55pm

NEWMAN C. BRACKIN
CLERK OF CIRCUIT COURT

BY: Beth McDonald
Deputy Clerk

CIR/CT.02 12/90

EXHIBIT B

IN THE CIRCUIT COURT IN AND FOR OKALOOSA COUNTY, FLORIDA

KABIR INC et al
Plaintiff(s)

vs.

Case No. 2003 CA 004209 S

HOWARD JOHNSON INTERNATIONAL INC
Defendant(s)

______________________________________/

## MEDIATION & SCHEDULING ORDER

THIS COURT having been notified of the filing of the above action, hereby orders as follows:

1. This cause shall be considered ripe for mediation 150 days after the filing of the initial complaint unless completely resolved during that time period.

2. Within said 150 days, all parties shall conduct discovery sufficient to be prepared for mediation in good faith.

3. At 150 days from the date of filing of the initial complaint, Plaintiff shall initiate the scheduling of mediation. If the parties are unable to agree upon a mediator, upon notice to the court a mediator will be court appointed.

4. Mediation is required to be held within 90 days of expiration of the 150 days from date of filing.

If unable to mediate within the time period herein ordered, counsel shall be required to obtain leave of court and/or provide a stipulated order extending time for mediation.

5. Counsel is cautioned that failure to comply with the terms of this Order may result in sanctions being imposed for non-compliance.

DONE AND ORDERED at Shalimar this October 13, 2003

/S/ JERE TOLTON
Circuit Judge

Copies furnished this to:

Plaintiff/Plaintiff's Counsel

NEWMAN C. BRACKIN
CLERK OF CIRCUIT COURT

Beth McDonald
Deputy Clerk

EXHIBIT C

Location: **Destin, FL**
Entity No. ____________
Unit No.: 7281

**HOWARD JOHNSON INTERNATIONAL, INC.**
**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT ("Agreement"), dated Dec. 7, 2001, is between HOWARD JOHNSON INTERNATIONAL, INC., a Delaware corporation ("we", "our" or "us"), and Kabir Inc., a ______________ corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Howard Johnson" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Howard Johnson Express Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, brand, cooperative or registered mark during the Term.

**2. International Operators Council, Inc.** You are automatically a member of the INOC and are entitled to vote at its meetings on the basis of one Chain Facility, one vote. The purpose of the INOC will be to consider, discuss, and make recommendations on common issues relating to the operation of Chain Facilities. We will seek the advice and counsel of the INOC Board of Directors and its various committees. We will assist the INOC to function in a manner consistent with the best interests of the Chain, and to adopt its governing rules to be consistent with the best interests of the Chain.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score at least 400 points (or equivalent) under our quality assurance inspection system and be ready to open for business under the System, is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of at least 400 points (or equivalent) before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date





EXHIBIT D

as the Punch List requires so that the Facility scores at least 425 points (or equivalent) on a quality assurance inspection within nine (9) months after the Opening Date. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will

be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager will attend the training programs described in Section 4.1 we designate as mandatory for licensees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.**

3.6.1 You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2 You may participate in any regional marketing training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.3 You will participate in marketing programs approved by the INOC Board of Directors. These may require you to pay transaction or other fees to support guest rewards and other incentive programs.

3.6.4 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the

full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8 **Financial Books & Records; Audits.**

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each

of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which will not exceed $500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may publish and disclose the results of quality assurance inspections.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Howard Johnson International, Inc., Cendant Finance Holding Corporation and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** You or your representative and your general manager will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we or the INOC Board of Directors hold an annual Chain conference. Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a conference. The Fee we set will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference. You will pay one Conference Fee for all of the Chain Facilities you own.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points or equivalent and the most recent quality assurance inspection score for the Facility was at least 400 points or equivalent when the Facility is otherwise eligible for a Minor Renovation.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1 **Training.** We will offer management orientation training, owners orientation training, property opening training, recurrent training and supplemental training.

4.1.1 **Management Orientation Training.** Between 60 days before and six months after the projected Opening Date, we will offer at a location in the United States we designate and a Facility manager (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Any replacement manager of the Facility must complete the training program within the time specified in the System Standards Manual. You must pay the tuition in effect for this program when your initial or replacement manager signs up for it. Tuition for management orientation training is $975 as of April 1, 2001. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2 **Owners Orientation Training.** If this is your first System franchise, we will offer and you (or a person with executive authority if you are an entity) must attend owners orientation training within 60 days after the Effective Date. We will conduct the owners orientation program to familiarize you with the System, the Chain, and our services. Owners orientation will be no longer

than three days. You must pay the tuition in effect for this program when you sign up for it. Tuition is $825 as of April 1, 2001. You must also pay your travel, lodging, meal and incidental expenses.

4.1.3 **Property Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, a property opening training program (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial property opening training program. We may require refresher training if the Facility does not meet Operations Standards. You will pay the cost of any site used if the Facility is not available. You must provide lodging for the trainers at your expense. You must also pay the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for the initial property opening training.

4.1.4 **Recurrent Training.** We will provide training for you and the Facility's manager if we determine that additional training for franchisees and managers is necessary from time to time. Training will be held at our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this program. This training may be held in conjunction with a Chain or regional conference or workshop. If recurrent training is held at your Facility, you must also pay for the trainer's reasonable travel, lodging, meal and out-of-pocket expenses. We may assess you a reasonable charge for course materials.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Room Sales Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains. We may use Room Sales Charges we collect to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3 **Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion, after consultation with and the approval of the INOC Board of Directors: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs. We may require your participation in marketing programs approved by the INOC Board of Directors, and administer those programs on behalf of the INOC.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.3.4 We may use Marketing Contributions we collect to reimburse our reasonable direct and indirect costs, overhead and other expenses of providing marketing, training and related services.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send

you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term**. The Term begins on the Effective Date and expires on the day prior to the fifteenth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of License Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Application and Initial Fees**. We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $**10,000.00**, based on the formula of $10,000.00 or $100.00 per authorized guest room, whichever is greater, when you sign this Agreement, which is fully earned when we sign this Agreement.

7. **Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. Recurring Fees are subject to Section 18 and include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "Marketing Contribution" as set forth in Schedule C for advertising, promotion, training and other related services and programs, accrues from the Opening Date until the end of the Term. We may increase or adjust the Marketing Contribution or establish other marketing charges from time to time if either approved by the Board of Directors of the INOC or a successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Chain Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for the purpose of considering the

change in the Contribution by the INOC Board of Directors and upon at least 15 days' notice from us.

7.1.3 A "Room Sales Charge" as set forth in Schedule C as well as such other Reservation System Charges as we establish from time to time, accrues from the Opening Date until the end of the Term, including during suspension periods. We may increase or adjust such Room Sales Charge on a Chain-wide basis, upon 60 days written notice to Licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs. You will also pay or reimburse us for commissions we pay to travel and other agents for certain reservations at the Facility, for incentives we pay to other Chain Facilities or their employees for booking reservations at your Facility, and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3 **"Interest"** is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a **Transfer** occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

**8. <u>Indemnifications</u>.**

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

9. **Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility of similar age and condition converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. <u>Our Assignments</u>.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign

this Agreement.

## 11. Default and Termination.

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Howard Johnson", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3 **Casualty and Condemnation.**

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor

advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Room Sales Charges accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

**12. <u>Liquidated Damages</u>.**

12.1 **Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties, Marketing Contributions and Room Sales Charges during the immediately preceding 24 full

calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties, Marketing Contributions and Room Sales Charges since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment. Before the Ending Period, Liquidated Damages will not be more than the product of $1,500.00 multiplied by the number of guest rooms in the Facility. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13. <u>Your Duties At and After Termination</u>.** When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Howard Johnson", including Room Sales Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of

any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15. Proprietary Rights.**

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location. There are no territorial rights or agreements between the parties. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible

medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

**16. Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of our employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17. Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Howard Johnson International, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

Your name: Kabir Inc.,
Your address: 713 Highway 98, Destin, FL 32541,
Attention: Anil Bhakta;
Your fax No.: 850-650-5843.

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will

not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the licensor, the licensee, any guarantor, and their respective successors and assigns.**

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8 **Protected Territory**. We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility [For Howard Johnson Express Inn License Agreements, insert: other than a Howard Johnson Plaza Hotel] in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **an area bounded to the south the Gulf of Mexico, to the North the Intercoastal Waterway, to the west commencing at the intersection of Midday Bridge and Highway 98 proceeding east along Highway 98 to Calhoon**.

**18. Special Stipulations.** The following stipulations apply to this Agreement and supersede any conflicting provision.

18.1 **Combined Fees.** Notwithstanding Section 7 of this Agreement, you will pay "Combined Fees," consisting of Royalties, the Marketing Contribution and Room Sales Charge, equal to 6.5% of Gross Room Revenues for the first and second License Years until you have paid us Combined Fees of $525.00 per guest room of the Facility in each such License Year and 7.0% of Gross Room Revenues for the third, fourth and fifth License Years until you have paid us Combined Fees of $575.00 per guest room of the Facility in each such License Year. If and when you pay aggregate Combined Fees equal to the stated dollar amount in each such License Year, you pay no additional Combined Fees for the balance of the License Year. You pay the Howard Johnson Miles program transaction charges, and the other fees and charges listed on Schedule C as and when due throughout the License Year. You resume paying Royalties, the Marketing Contribution and the Room Sales Charge after the fifth License Year. However, you will pay Combined Fees of 7.5% of Gross Room Revenues during the third and fourth License Years and at the rates set forth in Section 7 of this Agreement after the fourth License Year if (i) you default under the License Agreement and fail to cure the default within the time permitted under

the License Agreement and the default notice, or (ii) the average quality assurance inspection score of the Facility is less than 425 points on any two consecutive routine inspections after the opening inspection.

18.2 **Special Conversion Fee.** After the third License Year, if you convert the Facility to affiliation with the Days Inn, Ramada, Travelodge, Knights Inn, or Villager Lodge chains under a franchise or license agreement you sign before conversion, and the chain to which you convert the Facility is then owned by Cendant Corporation, then you will pay us no Liquidated Damages under this Agreement, and your initial fee with the new chain will be $10,000.

18.3 Your Additional Termination Right. You may terminate the License without cause or penalty effective only on the seventh or twelfth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 425 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 425 (or its then equivalent) in a reinspection to be performed no sooner than 60 days after the initial inspection.

18.4 **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the seventh or twelfth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

18.5 **Special Sales Program.** If and when the Facility achieves a quality assurance inspection score of at least 425 points, we will offer to provide you with a three day sales and marketing training program at the Facility at no charge to you. The program will focus on developing your Facility's sales and marketing capability, including customer identification, personal sales call techniques, sales and marketing planning, access to our marketing resources, creating sales literature, sales blitz campaign techniques, key account selling, local source development, telemarketing, front desk staff training and reservation summary analysis. The training program will be offered at a mutually convenient time before or within 18 months after the Opening Date of the Facility. You must provide or pay for lodging for the trainer. To qualify for the program, the Facility must score at least 425 points on a quality assurance inspection before the end of the first License Year.

18.6 **Your Test Period and Termination Right.** If and when the Facility achieves a quality assurance inspection score of at least 425 points, a two (2) year "Test Period" begins. During the

Test Period, you must cause the Facility to maintain an average quality assurance inspection score of at least 425 points, participate in all marketing programs designated as mandatory by the INOC Board of Directors and pay all Recurring Fees accruing during the Test Period when due. If you satisfy these conditions, and you are dissatisfied with your franchise for any reason, you may terminate the License without cause or penalty, and without payment of any Liquidated Damages, effective only on the third anniversary of the start of the Test Period provided you give us at least ten (10) months prior written notice of termination. You must cure any pending monetary or insurance default under this Agreement at the time notice must be given and at the effective date of termination. You must perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) you fail to complete the Punch List (if you convert rather than build the Facility) by the dates it specifies, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) the Facility scores less than 425 (or its then equivalent) on all quality assurance inspections performed during the first License Year.

**18.7 Free Property Management System. We will provide the Facility with an HSS 2 Property Management System if you open the Facility upon the earlier of (1) within 90 days of the Effective Date or (2) December 31, 2001.** The Integrated System Price for this System, inclusive of Base Hardware, Base Software, Installation and Initial Training is $15,396.00 (See Schedule C to Integrated System Agreement). There will be no initial cost to you for the delivery, installation and initial training. Instead, you must enter into the Development Advance Note attached to this Agreement. Under the terms of this Note, we will forgive one-third of the balance of the Note on each annual anniversary of the Opening Date. Accordingly, should the Facility remain in the System for three years, the entire $15,396.00 obligation will be forgiven. The Note is assignable should you transfer the Facility in accordance with Article 9 of your License/Franchise Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**HOWARD JOHNSON INTERNATIONAL, INC.**

By:________________________
Vice President

Attest:________________________
Assistant Secretary
Meric Craig Bloch
Senior Counsel, Legal

**YOU**, as licensee:
**Kabir Inc.**

By:________________________
**President**

Attest:________________________



HJEXC1 6/29/01
104912

# APPENDIX A

## DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of License Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Howard Johnson facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key

forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

INOC means the International Operators' Council, Inc., a Georgia non-profit corporation, its successors and assigns as the official organization of Chain licensees.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one-year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 713 Highway 98, Destin, FL 32541, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Howard Johnson" and other marks (U.S. Reg. Nos. 1,506,553; 714,495; 836,077;

1,506,552; 1,385,515; and 1,530,295) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, Marketing Contributions, Room Sales Charges, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Room Sales Charge means the fees set forth in Section 7.1.3 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual, and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer

does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Howard Johnson International, Inc., a Delaware corporation, its successors and assigns.

**SCHEDULE A**

(Legal Description of Facility)

# SCHEDULE B

PART I: YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|---|---|---|
| **Anil Bhakta** | **100%** | **common stock** |

PART II: THE FACILITY:

Primary designation of Facility: Howard Johnson **Express Inn**

Number of approved guest rooms: **75**

Parking facilities (number of spaces, description): **75**

Other amenities, services and facilities: **outdoor pool, meeting room**

PART III: DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

Howard Johnson

**FRANCHISOR: HOWARD JOHNSON INTERNATIONAL, INC.**
**"EXHIBIT A"**
**PUNCHLIST FOR CONVERSION**
**NOVEMBER 30, 2001**

---

**FACILITY**
Destin Express Inn (Former HJ#7289)
713 Highway 98 East
Destin, Florida

**TIER**
Express Inn

**GUEST ROOMS**
45 rentable
24 under renovation
6 manager's use/commercial laundry
75 total

**OWNER/APPLICANT**
Anil Bhakta
(850) 650-2236

**SALESPERSON**
Michael Stark
(813) 930-0379

**Q.A. REPRESENTATIVE**
Curt Keeton

## PROPERTY CONDITION SUMMARY

This 15 year-old property consists of one U-shaped, 2 story, single loaded, exterior corridor building constructed of concrete block with a stucco façade. Building exterior, public areas and guestrooms will require upgrading to comply with Company specifications. Additional landscaping will be required to enhance curb appeal.

Property has 24 rooms down for complete renovations, registration office is being enlarged, 5 rooms have been taken for the Managers apartment and office and 1 room taken to enlarge the commercial laundry area leaving a total of 69 rooms for the conversion. Property is the former Howard Johnson Express Inn #7289.

Property is located 7 miles from the waterslide amusement park, 10 miles to Eglin Air Force Base and 14 miles to the Airport. The market consists of 60% commercial and 40% leisure tourist. Area competition includes all major Hotel/Motel brands including a Days Inn and a Holiday Inn.

| | EXISTING | STANDARD |
|---|---|---|
| Lobby Dimensions: | 432 SF | 800 SF |
| Guest Room Dimensions: | 253 SF | 288 SF |

**COMPLETION TIME**
All items listed in this punchlist must be completed before opening as a Howard Johnson Express Inn.

2

Destin Express Inn
Destin, Florida

## [illegible]

In the interim, all Howard Johnson Express Inn signage must be concealed with a professionally installed, opaque cover.

## [illegible]

1 Upgrade building exteriors to include the following:
 a. Lobby is currently being expanded, repair all affected areas to a like new condition.
 b. Professionally clean and paint back of guestroom building to eliminate stained appearance.
 c. Paint building exteriors (fascia, soffits, storefronts, and stairwells). Contact the Design and Development Department for recommended color schemes.
 d. Replace windows to eliminate broken seals and fogged appearance.
 e. Professionally clean and chemically treat walkways, vending areas and steps to eliminate any stains. Recommend painting the walkways, vending areas and steps with a non-skid finish.
 f. Replace all walkway/building lights with upgraded fixtures that complement building exterior.

2. Upgrade swimming pool area to include the following:
 a. Professionally clean and chemically treat deck to eliminate any stains. Recommend painting deck with a non-skid finish.
 b. Install depth and "FT" markings on both vertical and horizontal coping tile to eliminate faded numbers.
 c. Replace worn and stained umbrellas. Ensure property has a minimum of 4 tables with umbrellas, 16 chairs, and 6 chaise lounge chairs.

3. Additional landscaping of seasonal hearty flowers to the entrance, pool area and perimeter area will be required to enhance curb appeal.

4. Reseal and stripe parking lot. Recommend the installation of wheel stops to prevent future walkway damage.

Destin Express Inn
Destin, Florida

## [illegible]

1. Lobby area is under complete renovations to enlarge the area and provide an up to date continental breakfast area. Ensure all upgrades meet Company specifications and include the following:
   a. Provide safe deposit boxes; 1 per 25 guest rooms, minimum of 4.
   b. A complimentary weekday newspaper, located at the front desk, is required.
   c. Provide new seating package to include tables. Adequate seating must be provided in the lobby area. Sofas and chairs must be commercial grade and fabric upholstered.
   d. Providing a decorative area rug for the seating area provided carpet is not installed. If carpet is installed, Company requires minimum 32-ounce cut pile or level loop carpet with padding. Carpet must be designed for commercial traffic.

2. The owner is responsible to provide facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances.

3. A voice mail message system is required.

4. Paint maids' carts.

5. Ensure new commercial laundry F F and E meets Company specifications and provides a clean, safe environment.

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS

1. A Company approved Property Management System (PMS) is required.
   a. Dot matrix printers will require a paper hole for the bottom feed of forms.
   b. A space for the file server must be made in the front desk area or in an area which is accessible 24-hours a day including the ability for the night auditor to utilize it.
   c. Space must be located near the file server for any interface equipment that will be needed, i.e.: call accounting and Point of Sale (POS) terminals. When considering the placement of this equipment remember that it will need electrical outlets and that the interface vendor will need to run cable from the interface equipment to the Property Management System (PMS).

## [illegible]

2. Hardware power requirements are as follows:
   a. Proper electrical connections must be in place or the Property Management System will not be installed. Refer to the Installation Guide for specifications.
   b. One Uninterrupted Power Supply (UPS) unit will be supplied with the package. The UPS must be placed at least three feet from the file server.
   c. The file server and its monitor will plug into the UPS using 2 of its power outlets.
   d. Each workstation will require 2 power outlets.
   e. Each printer and modem will require 1 power outlet each.
   f. The UPS will require 1 dedicated power outlet on its own dedicated circuit breaker.

3. Telephone line requirements are as follows:
   a. Two dedicated telephone lines with their own phone numbers are required. Three are recommended. No other modems, fax machines, etc are to be connected to these phone lines. For the third phone line, used for Internet access, we will allow a line to run through your phone switch.
   b. Two modems will be supplied with the package.

4. Interface vendors must be contacted in advance to insure that they will meet the requirements. The franchisee is responsible for arranging any required interface upgrades that may be necessary and for the testing of these upgrades.

5. All cable must be from a Company approved vendor. Refer to the Installation Guide for specifications.

## [illegible]

1. Howard Johnson Deluxe Continental Breakfast:
   a. Property must provide the Howard Johnson Deluxe Continental Breakfast. The breakfast must be prepared using the highest quality foods and presented in an attractive manner using the most up-to-date display equipment possible. The breakfast must be located in a Breakfast Area that the manager has arranged for proper supervision. Attention to detail and cleanliness must be a top priority.
   b. If the breakfast area is not a separate room and the breakfast is to be available in the lobby, the property must provide a decorative wall unit matching lobby decor and furnishings.

5

Destin Express Inn
Destin, Florida

## FOOD AND BEVERAGE FACILITIES CONTINUED

c. **HOURS:** The breakfast must be offered for a minimum of 3 hours between 6:00-10:00 A.M. seven days a week. Hours should be increased to accommodate occupancy demands. Hours must be posted at the entrance to the breakfast room. Guest must be notified of the breakfast and its hours upon check in.

d. **MENU:** An assortment of two fruit juices, including orange; coffee, decaf coffee, tea, and three of the following four selections: fresh fruit basket with a minimum of two selections/dry cereal/cold pastry/muffins/toaster bread.

e. This is a signature item of Howard Johnson Express Inn and must be in full operations upon the entry inspection.

f. Contact the Property Openings Department at (800) 343-7639 for additional information.

## GUESTROOMS [illegible]

**NOTE: 24 rooms are down for complete renovations. Prior to these rooms entering into the system, a total renovation of all FF&E to comply with Company specifications will be required. These rooms are to be inspected by a Quality Assurance Representative prior to entering the system.**

1. Upgrade guestroom entrance doors to include the following:
   a. Replace all entrance doors with a solid-core wood or a metal- encased door.
   b. Replace guestroom door numbers with a contemporary plaque design.

2. Upgrade connecting doors to include the following:
   a. Replace all hollow-connecting doors with solid wood doors.
   b. Provide a one way, doorknob latchset and a separate, non-keyed, 1" deadbolt lock. Operating knobs must be located on room side only with flush plates between doors.
   c. Remove slide bar locks and refinish doors to like new condition.

3. Install hardwired smoke detectors with a backup system. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.

Destin Express Inn
Destin, Florida

## [illegible] continued

4. Renovate guestrooms to include the following:

a. All furniture, finishes and fixtures must coordinate with other room furnishings.

b. Replacement of existing wall finish is required. Company requires 15-ounce vinyl wallcovering, 20-ounce recommended. A professionally applied, light textured finish is an acceptable alternative. Semi-gloss painted walls are not acceptable.

c. Paint ceilings to eliminate stains.

d. Provide 2nd nightstands where missing in king bedded rooms. One freestanding nightstand for a two-bedded room, two for a single bedded room is required.

e. Ensure each king bedded room is equipped with one wall mounted light source on each side of the bed located above the required nightstands. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable. Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not acceptable.

f. Replace/provide occasional chairs/recliners where stained or missing as in rooms #228 and #116. Two armed chairs per room are required. Chairs must be fabric covered.

g. Provide a fabric covered desk chair where missing as in room #134. A desk chair per desk is required.

h. Replace/repair wallcovering to eliminate torn areas where in-room safes have been removed. Company requires 15-ounce vinyl wall covering, 20-ounce recommended. A professionally applied, light textured finish is an acceptable alternative.

i. Refinish scuffed luggage benches as in room #238. If condition cannot be restored to a like "new" condition, total replacement or removal will be required.

j. Replace stained lampshades.

k. Provide/replace HVAC grills where missing or broken. Ensure all HVAC units are in good working order.

l. Provide pictures where missing as in rooms #226 and #139. Provide a minimum of two framed pictures with glass front in each guestroom. Minimum size required is 20"x 24".

m. Replace tarnished closet racks.

n. A minimum of 60% of guestrooms must be prepared and designated as non-smoking rooms.

o. Install Data ports in all guestrooms.

p. Provide an AM/FM clock radio in each guestroom.

q. Replace full-length mirrors where peeling as in rooms #238 and #228. A full-length mirror is required in each guestroom.

r. Provide UL approved fire resistant wastebaskets.

s. Full size ironing board and steam iron, with automatic shut-off feature and UL approved required in all rooms.

Destin Express Inn
Destin, Florida

## [illegible]

6. Renovate bath area to include the following:
   a. Repair and paint mildewed ceilings and doors.
   b. Replace de-silvering vanity mirrors as in rooms #222 and #139. Mirrors should extend the length of the vanity.
   c. Replace lighting. A new decorative fixture is required (incandescent or fluorescent lighting is acceptable). Fixture must be wall mounted over the vanity area.
   d. Replacement of existing wall finish is required. Company requires either vinyl wallcovering (minimum of 15 ounce) or an approved textured finish. Strongly recommend textured finish due to mildew problem.
   e. Replace 2" ceramic tile bathroom flooring. Company requires minimum 4" square, light neutral color non-slip ceramic tile (recommend 6"-8" square tile). VCT flooring and carpet are not acceptable in the bathrooms.
   f. Provide light covers where missing.
   g. Replace peeling tubs as in room #238. New tub liners are an acceptable option. Re-painting the tubs is not acceptable.
   h. Hair dryer with ESP (Electric Shock Protector) and UL approved are required in all rooms.

7. Company requires that all properties maintain housekeeping at the highest levels. We strongly recommend that the property implement housekeeping training programs to ensure customer satisfaction.

8. Currently, property is displaying Howard Johnson logo supplies. Discontinue this practice till property is brought back into the system. Logo supplies must be available at the entry inspection but may not be placed in the guestrooms until official opening.

## [illegible]

A minimum of 10% or 10 rooms, whichever is lesser, must be designated as "Home Office" and require the following items:

- A free- standing desk (42" X 22" or better, 48" X 30" or better for Plaza) with desk chair that matches casegood package.
- Desk lamp with 100-watt output with built in electrical outlet.
- 25" color television with remote control.
- A second telephone with data port in the telephone or the desk lamp base. Providing a cord with sufficient length to reach from the nightstand to the work area is an acceptable alternative. One telephone in these rooms must be cordless.

8

Destin Express Inn
Destin, Florida

[illegible]

- Coffee maker, with automatic shut-off and UL approved, and a selection of regular and decaffeinated coffees, tea and appropriate condiments. China/ceramic coffee cups recommended for Inns, required for Hotels and Plazas.
- Conditioner, lotion and mouth wash all with Howard Johnson logo.
- A nationally recognized newspaper, such as USA Today ®, The New York Times ®, Wall Street Journal ®, or major local publication with prior Company approval, must be delivered to the guest room each day.

A Welcome Gift is to be placed in each guestroom prior to arrival and replenished daily and consist of:

- Two snacks (minimum) in a basket on a tray with 2 sparkling/mineral water and 2 glass tumblers, napkin and welcome letter/card from the General Manager presented in an attractive manner.

**A maximum of one-half of the required 10% or 10 Home Office rooms may be supplemented with Crayola® Kid's Theme rooms.** Guestroom layouts must be as specified by the Design and Development Department. Howard Johnson International, Inc. must approve, in writing, any variation to the layout, theme or furnishings/furniture/amenities provided. Non-smoking room guestroom type highly recommended. Furnishings required as follows:

- Quilted bedspread(s) of an appropriate size for the bed. Bedspread specifications are: pattern - Titus TXS; color – Primary; 126" wide fabric, throw style, cottonette backing, 7 oz. fill; manufacturer – Fabricut; supplier – CSSI (Cendant Supplier Services).
- Decorative drape with 100% blackout capability. Drape specifications are pattern - Timberlake; color- Sapphire; manufacturer – Fabricut; supplier – CSSI (Cendant Supplier Services).
- One 24" x 24" children's activity table with molded edges. Specifications are Rosebud Manufacturing; Arizona Collection; all wood; finish to match existing casegood package; supplier – CSSI (Cendant Supplier Services).
- Two children's activity chairs with upholstered seat bottom matching the children's activity table. Specifications are Rosebud Manufacturing; Arizona Collection; wood frame; finish to match existing casegood package; supplier – CSSI (Cendant Supplier Services).
- One refrigerator/microwave combination unit.
- One video cassette player.
- Two children's artwork minimum 24" x 18" mounted, no glass fronts. Specifications are manufacturer - Creative Images, one print #21082 "Art in Bloom" and one print #21049 "Cars, Trucks, & Airplanes"; supplier - CSSI (Cendant Supplier Services).

9

Destin Express Inn
Destin, Florida

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards. The Franchisor does not warrant that completion of the items on this Punchlist will cause the converting facility to be in compliance with any applicable federal, state, local codes, ordinances or regulations. You (and your architect, contractor and engineer, if applicable) are solely responsible for conforming the Facility to the requirements of federal, state and local codes, ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on the date specified. The owner is responsible for meeting all Franchisor Standards. All repairs, replacements and improvements must cause the item to meet or exceed the Franchisor's standards published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the facility changes materially or the License (Franchise) Agreement to which this is attached is executed more than 90 days after the date of the Punchlist. Note, that ordinary wear and tear, particularly during busy seasons, may result in the need for additional work to meet entry standards of the Franchisor. Also, this Punchlist may become null and void if the property does not enter the System within 180 days after the punchlist date or as otherwise specified by the license (franchise) agreement.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be considered to be final until the License Agreement for the inspected facility is executed by the Company.**

**NOTE:** Any item on this Punchlist that is not required to be completed prior to opening as a Howard Johnson will continue to be evaluated for appearance and condition during all Quality Assurance evaluations conducted before the date when completion is required.

Signed: [signature] Date: 12-06-01

Print Name: Bharat A.

FL DESTIN DESTIN EXPRESS INN CV 80J

HOWARD JOHNSON INTERNATIONAL
**SCHEDULE C**
**March 2001**

A. Marketing Contribution

The Marketing Contribution is 2% of Gross Room Revenues, plus transaction charges to support the Howard Johnson Miles[sm] or successor guest loyalty program and any affinity card program we establish. The Howard Johnson Miles transaction charge is $3.00 each time a program member pays for a guest room at a qualifying rate if you participate in the automatic account debiting system. The charge is $4.00 per guest payment transaction if you pay the charge manually after we invoice you.

We may increase or adjust such Marketing Contribution from time to time if either approved by the Board of Directors of the INOC or its successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for that purpose by the Board of Directors upon at least 15 days' notice from us.

B. Room Sales Charge

The Room Sales Charge is 2.5% of Gross Room Revenues.

Notwithstanding the above, we may change the Room Sales Charge on a Chain-wide basis, after 60 days written notice to licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

C. Additional Reservation System Charges

The GDS Fee described in Section 7 is $4.00 per gross reservation communicated through the Global Distribution Systems. Internet-originated reservations carry fees of either (i) $2.50 per gross reservation booked through the Chain's web site or other Internet sources, or (ii) $7.00 per gross reservation booked over the TravelWeb.com Internet booking web site. Internet reservations may also carry travel agent commissions if the originator qualifies. If a reservation booked on the GDS, Chain web site or other Internet source, or TravelWeb.com, is canceled by the guest using the same source or web site as was used to make the reservation, you may not be charged the applicable fee. The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by a travel agent, plus our service charge of .75% of commissionable revenue. The general sales agent commission (also known as international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the travel agent commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue. We charge a you sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations, participating in our Member Benefits sales program, a portion of which we or an affiliate retains as a service fee.

If the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the INOC, you will be charged a "First Assessment" of $10.00 for each additional complaint received during that year. You will be contacted when the complaint is received and you will be responsible to resolve the complaint to the satisfaction of the guest. If any complaint for which you have received a First

# GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and Waiver of Jury Trial, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:

____________________

GUARANTORS:

____________________(Seal)
Anil Bhakta

Howard Johnson®

HOTELS & INNS

FRANCHISE ADMINISTRATION
Hotel Division

August 11, 2003

**VIA AIRBORNE EXPRESS**
#18699579754

Mr. Anil Bhakta
Kabir, Inc.
713 Highway 98
Destin, FL 32541

**RE: License Agreement, dated December 7, 2001, (the "Agreement") between Kabir, Inc. ("you" or "your") and Howard Johnson International, Inc. ("we" or "us") for the Howard Johnson® lodging facility located at Destin, FL/ #7289-96949-3 (the "Facility")**

Dear Mr. Bhakta:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Howard Johnson System (the "Notice"). This termination is effective as of August 11, 2003 (the "Termination Date"). You failed to cure your default under the Agreement for your failure to satisfy the required Quality Standards.

Because your License is terminated, you must now perform your post-termination obligations such as removal of all items that display or refer to Howard Johnson at the Facility. The de-identification procedures are specified in the attachment to this letter. These de-identification procedures must be completed within 14 days after the date of this Notice.

You must also immediately pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of August 7, 2003, you owe us $20,963.34 in Recurring Fees. This amount is described in more detail in the attached an itemized statement. Additionally, you must pay us Liquidated Damages of $63,913.41 as specified in the Agreement.

You must also repay the outstanding Development Incentive or similar loan as of the Termination Date. This carries a principal balance of $10,977.72 as of this date of this Notice.

Please know that, because your License has terminated, you also have lost your right to continue to use the seamless interface version of the Project Power Up property management system. You must now make your own arrangements with the software vendor for a new license, as stated in your Software & Services Agreement.



EXHIBIT E

Mr. Anil Bhakta
August 11, 2003
Page Two

If within the 14 day period described above, you do not timely remove the exterior signage which bears the name and marks of Howard Johnson, we intend to exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within 14 days of the date of this letter. Otherwise, we will confirm the date and time that our contractor will remove the signage from the Facility in a separate letter to you.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions regarding your obligations under this letter, please contact Kathy Cox, Senior Director of Franchise Administration, at 973-496-8478.

Sincerely,

James D. Darby
Vice President
Franchise Administration

Enclosure

cc: Ken Greene
Kathy Cox

Howard Johnson®
HOTELS & INNS

FRANCHISE ADMINISTRATION

## DE-IDENTIFICATION PROCEDURES

You must complete each of the following immediately:

1. Remove, replace or cover with an opaque cover the primary Facility signage.

2. Remove all interior signage that contains Howard Johnson Marks.

3. Change advertising billboards to remove Howard Johnson Marks.

4. Stop answering Facility telephone as Howard Johnson guest lodging facility.

5. Remove Howard Johnson name and Marks from any domain name, advertising and brochures.

6. Return to us all confidential operations and training manuals.

7. Remove the Howard Johnson name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8. Paint over or remove any distinctive Howard Johnson trade dress, paint schemes or architectural features.

9. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Howard Johnson facility.

10. Our quality assurance inspectors will visit the Facility at any time to verify that you have performed these de-identification obligations.

HOWARD JOHNSON INTERNATIONAL, INC.
1 Sylvan Way • Parsippany, NJ 07054 • Tel (973) 428-9700 • Fax (973) 496-5345

ITEMIZED STATEMENT 
FOR HOWARD JOHNSON #7289-96949 - Destin, FL
AS OF 2003-08-07

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|---|---|---|---|---|---|
| 6 | IN1032923-01 | 2003-06-18 | HJ SUPERMILES | 72.00 | |
| | IN1035114-01 | 2003-06-20 | JUN-HSS SOFTWR MAINT | 88.42 | |
| | TA2898845-01 | 2003-06-26 | T/A COMM SERVICE CHG | 126.21 | |
| | TA2898845-01 | 2003-06-26 | T/A COMMISSIONS | 1,681.30 | |
| | TP3898845-01 | 2003-06-26 | AIRLINE RESV FEE | 377.00 | |
| | 72890306A-01 | 2003-06-30 | ROYALTY ACCRUAL | 2,700.00 | ACR |
| | 72890306A-03 | 2003-06-30 | MKTG FEE ACCRUAL B | 1,400.00 | ACR |
| | 72890306A-06 | 2003-06-30 | RESERVATION FEE ACCR | 1,700.00 | ACR |
| | IN1042000-01 | 2003-06-30 | PROCS CHG Caroline D | 10.00 | |
| | IN1042000-02 | 2003-06-30 | PROCS CHG Robert Pul | 10.00 | |
| | | | | 8,164.93 | |
| 7 | IN1046813-01 | 2003-07-11 | 2004 HOJ-ROC DUES | 1,215.00 | |
| | IN1047396-01 | 2003-07-14 | PROCS CHG Angelika C | 10.00 | |
| | IN1048145-01 | 2003-07-15 | HJ SUPERMILES | 28.00 | |
| | IN1053114-01 | 2003-07-21 | JLY-HSS SOFTWR MAINT | 88.42 | |
| | IN1060808-01 | 2003-07-28 | PROCS CHG Georgia Mc | 10.00 | |
| | 72890307A-01 | 2003-07-31 | ROYALTY ACCRUAL | 3,000.00 | ACR |
| | 72890307A-03 | 2003-07-31 | MKTG FEE ACCRUAL B | 1,600.00 | ACR |
| | 72890307A-06 | 2003-07-31 | RESERVATION FEE ACCR | 1,900.00 | ACR |
| | TA2903125-01 | 2003-07-31 | T/A COMM SERVICE CHG | 291.89 | |
| | TA2903125-01 | 2003-07-31 | T/A COMMISSIONS | 3,895.60 | |
| | TP3903125-01 | 2003-07-31 | AIRLINE RESV FEE | 759.50 | |
| | | | | 12,798.41 | |
| | | | | 20,963.34 | |